

**SIGNED this 18 day of December, 2009.**

_____
**JOHN T. LANEY, III
CHIEF UNITED STATES BANKRUPTCY JUDGE**
_____

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | CASE NO.: 09-70328- JTL |
| DANIEL L. ALTMAN, ) | |
| ) | |
| Debtor. ) | CHAPTER 7 |
| ) | |

**Memorandum Opinion**

This matter comes before the court on the United States Trustee's Motion to Dismiss Pursuant to sections 707(b)(2) and 707(b)(3) of the bankruptcy code based upon presumption of abuse and totality of the circumstances. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(A).

On February 27, 2009, the above captioned debtor, Daniel Altman, filed for relief under Chapter 7 of Title 11 of the United States Code. The United States Trustee filed a

motion to dismiss pursuant to 11 U.S.C. §707(b)(2) and §707(b)(3) on May 14, 2009. Arguments on the motion were heard on September 23, 2009. During the hearing, counsel for the debtor requested an opportunity to file a brief supporting the debtor's position. The court granted this request and permitted counsel of the United States Trustee fifteen days to file a response brief. The debtor filed his brief with the court on October 5, 2009. The Trustee filed his response on October 8, 2009.

## Statement of Facts

Daniel L. Altman ("debtor") filed for relief under chapter 7 of the Bankruptcy Code on February 27, 2009. The debtor's current monthly income was at that time and is still $77,233.64 per year. The median income for a single debtor in the state of Georgia was $39,253 at the time this case was filed. The parties have stipulated that the debtor's net income is currently $4,251.71 per month. Because the debtor is above the median income, he completed the full Official Form B22 (means test). On line 42 of his means test, the debtor deducted mortgage payments in the amount of $3,273 on real estate located at 4622 Tillman Bluff Road. The debtor filed a statement of intention to surrender his interest in the real estate.

The debtor is divorced and resides in Valdosta, Lowndes County, Georgia. The debtor's divorce was finalized on February 6, 2009. The debtor shares custody of his six year old son. The divorce decree allows the debtor visits with his son every other weekend and during holidays, as well as six weeks during the summer. The debtor currently earns gross income of $6,422 per month and net income of $4,251.71 per month as an administrator in the Valdosta City School System, with whom he has been employed for 16 years.

The debtor filed schedules with the Court on February 27, 2009 certifying they were true and correct. The debtor has not filed any amendment to his schedules. Schedule J indicates that monthly, the debtor spends $1,200 for rent, $300 estimated for a divorce attorney, and $243 to Valdosta Teacher's Federal Credit Union. Schedule J allots $25 per month for recreation and $100 per month for miscellaneous expenses. Schedule B shows the debtor has a 403(b) retirement account with a value of $1. Schedule E indicates the debtor has no domestic support obligations. There are major discrepancies between the debtor's filed schedules and the debtor's testimony and handwritten budget.

The debtor's testimony shows the debtor spends $400 for rent each month, anywhere from $18.55 to $99.77 to his divorce attorney per month, and has no intention of paying anything to the credit union. The debtor also testified that his 403(b) retirement account had a value of approximately $50,000 when this case was filed and now has approximately $40,000 remaining in the account. The debtor's bank statements from February 19, 2009 through July 17, 2009 indicate the debtor spends at least $383 per month on recreation, including liquor, movies, camping, and golf.[1] The debtor also spends approximately $150 per month for cigars.[2]

The debtor has a domestic support obligation in the monthly amount of $921.45 to Randi Altman for their son. Schedule F indicates the debtor owes a debt to his parents in the amount of $67,000. The debtor's testimony indicates that his parents will not require him to repay this debt, but it will be deducted from any future inheritance. The debtor's Schedule A and testimony at the hearing indicate there is equity in his former residence.

---

[1] The debtor testified that on his handwritten budgets, submitted into evidence, that the "misc" listed on the budgets include mostly recreation. The budgets for May through August 2009 indicate these miscellaneous amounts range from $350 to $500 per month.

[2] This amount is labeled "Sam's C" on debtor's handwritten budget.

The debtor has reaffirmed the debt to Citizens Automobile Finance, Inc. secured by his 2006 Ford pickup truck. The reaffirmation agreement indicates a balance of $32,220 remaining on this loan with an interest rate of 7.9% and payments of $648.25 per month. The debtor testified he is current with payments on this loan.

## Conclusions of Law

**1. The debtor may deduct payments on secured debts on the means test pursuant to §707(b)(2).**

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") was enacted in response to an upward trend in consumer bankruptcy filings and concerns that bankruptcy relief was "too readily available" and "sometimes used as a first resort, rather than a last resort." In re Rudler, 576 F.3d 37 (1st Cir. 2009) (citing H.R.Rep. No. 109-31(I), at 4 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 90.) The pursuit of Chapter 7 liquidations instead of Chapter 13 debt repayment plans by consumer debtors who could afford to repay some of their debts was of particular concern. See 151 Cong. Rec. S2459, 2468-70 (daily ed. Mar. 10, 2005) (Statement of Sen. Hatch); In re Hardacre, 338 B.R. 718, 720 (Bankr. N.D. Tex. 2006) (citing 151 Cong. Rec. at 2469-70).

Under section 707(b)(1), the court, after notice and a hearing, may dismiss a Chapter 7 case or, with the debtor's consent, convert it to Chapter 13, if the court finds that granting relief under Chapter 7 would be an abuse of the provisions of Chapter 7. 11 U.S.C. 707(b)(1). "In considering ... whether the granting of relief would be an abuse of the provisions of [Chapter 7], the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of ... 25 percent of the debtor's nonpriority

unsecured claims in the case, or $6,000, whichever is greater, or ... $10,000." 11 U.S.C. 707(b)(2)(A)(I). This presumption can be rebutted by a demonstration of "special circumstances," such as a serious medical condition or active duty military service, which justify additional expenses or adjustments to current monthly income. 11 U.S.C. 707(b)(2)(B).

For purposes of this test, the debtor's current monthly income ("CMI) is "the average monthly income from all sources that the [debtor and spouse receive] without regard to whether such income is taxable income, derived during the 6-month period ending on ... the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii)." 11. U.S.C. 101(10A). Section 707(b) permits the debtor to subtract from CMI certain expenses. The applicable expenses are generally established by the IRS National Standards and Local Standards for the area in which the debtor resides, but, in some instances, the debtor is permitted to deduct actual expenses. 11 U.S.C. 707(b)(2)(A)(ii). Debtors are to use the expenses in effect as of the petition date. 11 U.S.C. 707(b)(2)(A)(ii)(I). Additionally, debtors are permitted to deduct average monthly payments for secured and priority debts. 11 U.S.C. 707(b)(2)(A)(iii).

The instant case delves into the proper interpretation of section 707(b)(2)(A)(iii), which permits a deduction for secured debt payments. As of the writing of this Memorandum Opinion, only the 1st Circuit has addressed whether the means test for identifying an abusive Chapter 7 petition allows a debtor to deduct from his income the installment payments due for property he plans to surrender in the bankruptcy. Rudler, 576 F.3d at 37. The Rudler court concluded that under the means test, a debtor may

deduct from his current monthly income long-term secured debt payments that are allowed on the petition date, regardless of whether a debtor intends to surrender the property securing the debt. 576 F.3d at 37.

In Rudler, the debtor's stated intention was to surrender his home. Id. The home was subject to two mortgages with monthly payments of about $4,000. The debtor deducted the mortgage payments on his Form B22A monthly disposable income resulting in negative monthly disposable income and avoiding a presumption of abuse. The U.S. Trustee moved to dismiss the case as abusive and argued that the debtor should not have included the mortgage debts in his calculations of secured debt because he intended to surrender the property. The Rudler court held that such a deduction was permitted, relying upon the fact that a vast majority of bankruptcy courts to consider the issue have concluded that the "plain language" of section 707(b)(2) permits Chapter 7 debtors to deduct payments on a secured debt even when the debtor plans to surrender the collateral underlying that debt. See, e.g., In re Norwood-Hill, 403 B.R. 905, 910 (Bankr. M.D. Fla. 2009); In re Crawley, No. 08-14419-SSM, 2009 WL 902359, at *3 (Bankr. E.D. Va. Feb. 23, 2009); In re Hayes, 376 B.R. 55, 63 (Bankr. D. Mass. 2007); In re Hartwick, 359 B.R. 16, 19-20 (Bankr. D. N.H. 2007); Randle, 358 B.R. at 363-64; *In re Sorrell,* 359 B.R. 167, 186 (Bankr. S.D. Ohio 2007); In re Haar, 360 B.R. 759, 766-67 (Bankr. N.D. Ohio 2007); In re Chang, No. 07-50484-ASW, 2007 WL 3034679, at *3 (Bankr. N.D .Cal. Oct. 16, 2007); In re Walker, No. 05-15010-WHD, 2006 WL 1314125, at *4 (Bankr. N.D. Ga. May 1, 2006); but see, e.g., In re Naut, No. 07-20280REF, 2008 WL 191297, at *8 (Bankr. E.D. Pa. Jan. 22, 2008); In re Harris, 353 B.R. 304, 309-310 (Bankr. E.D. Okla. 2006); In re Skaggs, 349 B.R. 594, 599-600 (Bankr. E.D. Mo .2006).

The court must begin the analysis of this case "where all such inquiries must begin: with the language of the statute itself." United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). "[W]hen the statute's language is plain, the sole function of the courts-at least where the disposition required by the text is not absurd-is to enforce it according to its terms." See Lamie v. United States, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ( quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000); Ron Pair, 489 U.S. at 241, 109 S.Ct. 1026; Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)).

The specific language of the statute defines deductible secured debt as amounts that are "scheduled as contractually due to secured creditors in each of the 60 months following the date of the petition." 11 U.S.C. 707(b)(2)(A)(iii). The courts have focused in particular on two aspects of the text: the significance of the phrase "scheduled as contractually due" and the forward-looking nature of the reference to the period "*following* the date of the petition." See Rudler, 576 F.3d at 45.

 A cogent analysis is provided by the Trustee and those courts which have concluded that the statute provides for a future oriented approach in which the debtor's *actual* payments made in the 60 months following the date of the petition should control. Skaggs, 349 B.R. 599-600. The future oriented approach rests on the contention that once a debtor surrenders the collateral, nothing remains "contractually due," and even if a deficiency is owed, the remaining liability is not "contractually due to a *secured* creditor." The other view, advocated by, *inter alia*, the Walker court, adopts the "snapshot approach." See, e.g., In re Walker, 2006 WL 1314123 at *3, 2006

Bankr.LEXIS 845 at *9. Under the "snapshot approach," which is the majority rule, courts have held that long-term secured payments that are "scheduled as contractually due" on the petition date may be deducted on the means test without factoring in the debtor's future intention to surrender the encumbered property. Id. This Court is convinced that the conclusion of the Walker and Rudler courts is the correct one.

### A. Scheduled as Contractually Due

The Trustee argues that "reading the phrase 'scheduled as contractually due' to include all current contractual obligations fails to give independent meaning to the words 'scheduled as.'" The Trustee argues: "If Congress meant for debtors to deduct all 'contractually due' payments without regard to whether they would actually be made, it could have left out the phrase 'scheduled as' and defined 'payments on account of secured debts' as payments that are 'contractually due . . . following the date of the petition' instead of 'scheduled as contractually due . . . following the date of the petition.'" To give effect to the separate term "scheduled as," the Trustee maintains that the statute must be read as asking for a forward-looking assessment of whether the payments actually will be made. As the court in Rudler has eloquently addressed the preceding argument delineated by the Trustee, this court will defer to that language in addressing the Trustee's point. The Rudler court explains:

> The word "scheduled," however, does not connote the confirmation of payments to be made that the Trustee ascribes to it. Indeed, it implies the contrary recognition that such payments, although "scheduled," may in fact not be made; otherwise, the request would more logically have been for information about all payments that will be made to creditors during the targeted sixty-month period, or all payments the debtor expects or intends to make during that time frame. See Walker, 2006 WL 1314125, at *4 (noting that the word "scheduled" "implies the possibility that the payments may not be made as required under the contract"). As other courts have observed, if Congress had sought to exclude secured debt on properties the debtor has stated an intention to surrender, "it could easily have said

so." Randle, 358 B.R. at 363; see also, e.g., Hartwick, 359 B.R. at 19; Walker, 2006 WL 1314125, at *4 (noting that "Congress could have specified that the payments to be deducted are only those payments to be made on secured debts that the debtor intends to reaffirm"). Congress's "choice of language shows a clear intent not to impose any such limit on debtors." Randle, 358 B.R. at 363.

The Trustee also argues that "scheduled as" must be construed in the specific context of the Bankruptcy Code, where the word "schedule" and the phrase "scheduled as" are used as terms of art. Again, the Rudler court explains:

> This argument invokes a debate in the cases that address section 707(b)(2)(A)(iii)(I) between "two main interpretive camps"-one concluding that the word "scheduled" refers to a debt being listed on the debtor's formal bankruptcy "schedules," and the other adopting "the common, dictionary-defined meaning of 'scheduled' as 'planned for a certain date.' " Hayes, 376 B.R. at 61; see also Haar, 360 B.R. at 764-65; Skaggs, 349 B.R. at 599. The Trustee argues here that the Code refers to claims or debts being "scheduled as" due if the debt is properly listed on a debtor's bankruptcy schedules, and she asserts that "scheduled as contractually due" should thus be limited to those contractual obligations "properly listed on a bankruptcy schedule because the debtor intends to honor them."
>
> The primary problem with this argument, as recognized in Hayes and other cases cited therein, see 376 B.R. at 62, is that section 707(b)(2)(A)(iii)(I) does not refer directly to any bankruptcy schedules, and there is no schedule that asks a debtor to identify obligations that are "contractually due" at the time of the petition, but that may be resolved through surrender of the collateral. See id.; see also Sorrell, 359 B.R. at 185 ("[A] debtor's statement of intention is not a schedule."); Randle, 358 B.R. at 365; In re Nockerts, 357 B.R. 497, 502 (Bankr.E.D.Wis.2006) (noting that, when describing the bankruptcy schedules, Congress "include[s] in the statute a reference to the schedules, either directly by name or indirectly by reference to § 521, the provision that requires the debtor to file bankruptcy schedules"). Moreover, to the extent that appearance on a "schedule" is a prerequisite for including a debt in the means test calculation, Schedule J, which lists the debtor's expenses as of the petition date, could be expected-as in this case-to include any mortgage payments due at that time, without regard for the debtor's future intentions with respect to the underlying property. See Randle, 358 B.R. at 365 (noting that Schedule J "normally includes mortgage and car payments "due" at the time the bankruptcy petition is filed).

Moreover, the debtor's contractual liability for the debt is not eliminated upon the surrender of the collateral. At the earliest, it may be eliminated by the entry of the discharge. In other words, nothing the debtor does or does not do changes the fact that scheduled payments remain contractually due. See Walker, 2006 WL 1314123 at *4, 2006 Bankr.LEXIS 845, *12-13.[3]

### B. Following the Date of the Petition

The Trustee further argues that Congress, in using the word "following," contemplated a projection of future expenses- i.e., expenses that will exist "following" the bankruptcy proceedings - rather than a snapshot of current expenses. Again deferring to the Rudler court:

> Again, however, that interpretation is not supported by the words themselves, which are forward-looking only in the sense that the required current calculation is for debts that are scheduled into the future. See Hayes, 376 B.R. at 63 (noting that the provision is " 'forward-looking' in the sense that it takes into account payments" required in the future, but that "it is clear from the plain language of the provision that this determination is to be made at the time the petition is filed "); Haar, 360 B.R. at 766. The Trustee attempts to change this plain meaning by analogy, asserting that other deductions allowed by the means test are forward-looking and that the deduction for secured debts should be treated consistently with the treatment of such other expenses
>
> As the Trustee acknowledges, however, the statute sets allowable expenses by means of several different methods, and, "[l]ike section 707(b)(2)(A)(iii), many other provisions of the means test appear to operate contrary to the goal of accurately determining the amount of income that would actually be available for payments to unsecured creditors in a Chapter 13 case." Walker, 2006 WL 1314125, at *6. For example, the starting point for the means test, current monthly income, is calculated as the average income earned by the debtor in the six months preceding the bankruptcy filing. See 11 U.S.C. § 101(10A)(A); Crawley, 2009 WL 902359, at *4; Walker, 2006 WL 1314125,

---

[3] "When a debtor files the bankruptcy petition, the debtor is contractually due for payments on the outstanding secured debts for the length of the contract. The debtor's contractual liability for the debt is not eliminated upon the surrender of the collateral. At the earliest, it may be eliminated by the entry of the discharge. At the latest, the contractual obligation may never actually be eliminated, but instead, the creditor would merely be enjoined from collecting the debt from the debtor *in personam*."

at *5. By the time of the filing, the amount of actual income could be dramatically different from the previous six-month average-for example, if the debtor has just lost his job or secured a new one. See <u>Hayes</u>, 376 B.R. at 65; <u>Walker</u>, 2006 WL 1314125, at *5.

Even on the expense side of the calculation, the means test relies on standard deduction amounts for certain types of expenses that may be "either significantly less than or greatly in excess of the debtor's actual expenses." <u>Walker</u>, 2006 WL 1314125, at *7; <u>see also</u> <u>Hayes</u>, 376 B.R. at 65; <u>Randle</u>, 358 B.R. at 364. For example, the IRS has prescribed standard amounts to be used in the means test calculation, instead of the individual debtor's actual costs, for certain categories of expenses (food, housekeeping supplies, and transportation). <u>See</u> 11 U.S.C. § 707(b)(2)(A)(ii)(I); Eugene R. Wedoff, Means Testing in the New § 707(B), 79 Am. Bankr.L.J. 231, 251-261 (2005). Thus, the future inaccuracy of the snapshot-in-time approach to the expense for secured debt does not help the Trustee's argument. <u>See</u> <u>Hayes</u>, 376 B.R. at 65 ("It cannot be fairly said, therefore, that Congress was overly-concerned with capturing an accurate, precise financial picture to determine whether the case would be presumed abusive."); <u>Randle</u>, 358 B.R. at 364 ("Congress adopted a test for the presumption of abuse that relies primarily on standardized estimates of expenses, not the debtor's actual expenses."); <u>Walker</u>, 2006 WL 1314125, at *6 ("[M]any other provisions of the means test appear to operate contrary to the goal of accurately determining the amount of income that would actually be available for payments to unsecured creditors....")

### C. On Account of Secured Debts

Finally, the Trustee argues that the surrender and transfer of title to the collateral securing a debt changes any remaining debt to an unsecured one, meaning that any future payments will not be made "on account of secured debts." As the <u>Walker</u> courts explains:

> Finally, the filing of the debtor's statement of intention indicating an intent to surrender collateral does not render the secured creditor an unsecured creditor. Following the filing of the case, the debtor may decide to amend the statement of intention to provide for reaffirmation of the debt or redemption of the property, or may even seek to reaffirm or redeem, notwithstanding the inability to amend the statement of intention. See <u>In re Rodgers</u>, 273 B.R. 186, 192 (Bankr.C.D.Ill.2002) (permitting the debtor to redeem property, notwithstanding the debtor's failure to file the motion to redeem until after the expiration of the 45-day deadline); <u>see also</u> <u>In re Chance</u>, 1994 WL 16005470, *3 (Bankr.S.D.Ga. May 3, 1994) (holding that "a debtor may exercise his right of redemption at any time before the case is closed or a foreclosure sale of the

property has occurred"). Even if the debtor does surrender the collateral, the surrender of the collateral does not change the fact that the payments are "scheduled as contractually due to a secured creditor." Following the surrender of the collateral, the creditor remains a secured creditor at least until the collateral has been liquidated and the proceeds are applied to satisfy the debt.

This court thus concludes that, in calculating monthly income under the means test, the plain language of section 707(b)(2)(A)(iii)(I) allows debtors to deduct payments due on secured debts notwithstanding the debtor's intention to surrender the collateral. However, despite finding that a presumption of abuse does not arise in the instant case, the court may still find the case abusive pursuant to section 707(b)(3) of the bankruptcy code.

**2. The debtor's case is abusive pursuant to 707(b)(3).**

Under amendments made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), a court may, pursuant to section 707(b)(1), dismiss a chapter 7 case filed by an individual with primarily consumer debts if it finds that granting relief would constitute an abuse of chapter 7. See In re Paret, 347 B.R. 12 (Bankr. D. Del. 2006); see also Eugene Wedoff, Means Testing in the New 707(b), 79 Am. Bankr. L.J. 231, 236 (2005) ("because the general abuse provisions of section 707(b)(3) expressly apply when the means test has been rebutted, 'passing' the means test does not preclude a discretionary finding of abuse by the court."). A court may determine whether such abuse exists under two distinct and independent bases. First, pursuant to section 707(b)(2)(A)(i), a presumption of abuse may arise based on a mathematical analysis factoring in historic income, statutory expense standards and select actual expenses. Second, if the presumption does not arise or a debtor rebuts it, a court must still determine whether a case is abusive under section 707(b)(3). In particular, a court "shall

consider" whether the case was filed in "bad faith" or whether "the totality of the circumstances of the debtor's financial situation...demonstrates abuse." 11 U.S.C. §707(b)(3)(A) and (B).

In In re Rollins, 2007 Bank. Lexis 2459 (M.D. Ga. 2007), Judge Hershner stated that in considering a motion to dismiss for abuse under 11 U.S.C. 707(b)(3):

> [c]ourts look to pre-BAPCPA case law in considering bad faith and the totality of the circumstances under BAPCPA. In re Henebury, 361 B.R. 595 (Bankr. S.D. Fla. 2007); In re Metemaker, 359 B.R. 849 (Bankr. N.D. Ohio 2007); In re Pak, 343 B.R. 239, 243 (Bank. N.D. Cal. 2006); In re McIvor, 2006 Bankr. LEXIS 3861, 2006 WL 3949172 *4 (Bank. E.D. Mich. Nov. 15, 2006).

The debtor cites a myriad of factors to take into consideration when determining whether to dismiss for abuse pursuant to section 707(b)(3).[4] Among the most important of these factors is the debtor's ability to fund a Chapter 13 plan. See In re Pak, 343 B.R. at 244; see also In re Paret, 347 B.R. 12 (Bankr. D. Del. 2006) and In re Pennington, 348 B.R. 647 (Bankr. D. Del. 2006). The United States Trustee has successfully argued pre and post BAPCPA that the ability to pay on its own is cause for dismissal. *Pre-BAPCPA,* see In Re Lamberth, (05-55070 M.D. Ga. 2006 - unpublished) (Judge Hershner found substantial abuse where debtors stipulated that they had $400 in disposable income, even though they argued more factors were required for such a finding under the totality of the circumstances). *Post BAPCPA,* see In Re Yawn, (06-50975 M.D. Ga. 2009 - unpublished) (Judge Hershner found disposable income and hence abuse where debtors

---

[4] These factors include, *inter alia*, (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay; (3) Whether the debtor's proposed family budget is excessive or unreasonable; (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; (5) Whether the petition was filed in good faith; (6) Whether the debtor is eligible for Chapter 13 relief; (7) Whether the debtor has a stable source of income; (8) Whether the debtor's expenses could be reduced without depriving him or his dependents of necessities.

were contributing funds to their 401k and adult children's college expenses instead of paying their unsecured creditors).

In the instant case, the debtor should have the ability to repay a portion, if not all of his remaining unsecured debts. The debtor earns in excess of $77,000 per year in gross income. This amount is $37,000 above the median income in Georgia. The debtor has worked for the same employer for 16 years. The parties stipulated that the debtor nets $4,251.71 per month. On Schedule J, the debtor list expenses totaling $5,058 per month, resulting in no disposable income. At the hearing on this motion the debtor testified that his housing expense is $400, not $1,200 per month. He also testified that he is paying $0, not $243 per month to the Valdosta Teacher's Federal Credit Union. He further testified that he is paying at most $99, not $300 per month to his divorce attorney. These three actual expenses reduce the debtor's Schedule J budget by $1,144 per month, to $3,914. Under this analysis, assuming no other modifications to his budget, the debtor has $337 to pay toward his unsecured debts ($4,251 minus $3,914 = $337). This would be more than enough to pay the Valdosta Teacher's Federal Credit Union debt (the only unaccounted for debt remaining in the case) of $16,526 in full over the period of a Chapter 13 plan.

The debtor makes various arguments regarding the reasonableness of his budget. At the hearing and in his brief, the debtor presents the idea that he cannot afford cable tv, a home telephone, or even clothes. The debtor also calls his liquor and cigar expenses "modest." However, after careful review of the debtor's own hand-written budgets, it is clear that the debtor is forgoing the above luxuries in favor of various recreational expenses, including liquor, tobacco, cigars, movies, golf, etc. The amount of money the

debtor's own handwritten post-petition budgets set aside for those two expenses totals at least $300 per month. Further, the debtor's post petition bank statements indicate that he actually spends almost $500 per month on average between liquor, tobacco, golf, and other entertainment.

It has been held that voluntary contributions to a 401k retirement plan are disposable income for purposes of section 707(b)(3). See In re Yawn; see also In Re Egebjerg, 574 F.3d 1045 (9th Cir. 2009) and In Re Belkhe, 358 F.3d 429 (6th Cir. 2004). Courts have also held that paying for college expenses for a debtor's children are considered disposable income. See In re Walker, 383 B.R. 830 (N.D. Ga. 2008); In Re Patterson, 392 B.R. 497 (Bkrtcy. S.D. Fla. 2008); In Re Davis, 2008 WL 4279547 (Bkrtcy. N.D. Ohio 2008). As the Trustee point out, if these expenses are considered abusive, then it logically follows that the aforementioned recreational expenses (whatever they may be) should also be considered abusive. Between these recreation expenses, as well as the other $350 -$500 in miscellaneous expenses set aside in the debtor's own budget, the debtor could afford clothing, internet, a home telephone, and other miscellaneous expenses, and still have enough money to contribute toward his unsecured debt.

The debtor is not entitled to, nor is he in need of a chapter 7 discharge. The facts show there is not likely to be a deficiency balance on the debtor's former residence. The debtor has voluntarily paid the Schedule F debt to Randi Altman and is voluntarily paying the Schedule F debt to George Saliba. The debtor will not be required to repay his parents. The debtor has reaffirmed the debt on his vehicle and has always maintained the payments. The only debt the debtor is ultimately not paying in this case is the Valdosta

Teacher's Federal Credit Union, a debt he was ordered to pay in his divorce, and a debt he included in his Schedule J budget with a payment of $243 per month. There is no question the debtor could repay the credit union without "depriving him and his dependents of necessities." Further, the debtor could pay this debt in or out of bankruptcy. The debtor is not suffering from any medical condition and has $40,000 remaining in a 403(b) retirement account. The debtor earns $77,000 per year and has worked for the same employer for the last 16 years.

As the Sixth Circuit noted, "(t)here is no constitutional right to a bankruptcy discharge, and the 'fresh start' provided for by the Code is a creature of congressional policy...(citations omitted)...Congress, within the limits set by the Constitution, is free to deny access to bankruptcy as it sees fit." In re Krohn, 886 F.2d 123, 127 (6th Cir. Ohio 1989). When Congress amended section 707(b), it sent a clear message to all bankruptcy participants, that is, relief under Chapter 7 is intended for needy debtors, not those with an ability to repay a portion of their debts.

ORDERED that unless the debtor voluntarily converts this case to a case under Chapter 13 of the Bankruptcy Code on or before 30 days after the date of this Memorandum Opinion, the Trustee's Motion to Dismiss will be granted and this Chapter 7 case will be dismissed pursuant to 11 U.S.C. §707(b)(3).